UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **SHANNON CLARDY, ET AL.** | **\*CIVIL NO. 6:09-1660** |
| **VERSUS** | **\*MAGISTRATE JUDGE HILL** |
| **BRUCE FOODS CORP., ET AL.** | **\*BY CONSENT OF THE PARTIES** |

<u>REASONS FOR RULING</u>

Pending before the Court are the Motions for Summary Judgement filed by third party defendant, Penick Produce Company, Inc. ("Penick") [rec. doc. 47] and third party plaintiff, Entergy Gulf States Louisiana, LLC ("Entergy") [rec. doc. 116]. Opposition to each Motion has been filed. [rec. docs. 51 and 130]. Penick filed a Reply. [rec. doc. 58]. Oral argument on the Motions was held and the Motions were taken under advisement. Post Hearing submissions were filed by each party. [rec. docs. 133 and 134].

For the reasons which follow, the Motion for Summary Judgment filed by Penick Produce Company, Inc [rec. doc. 47] is **GRANTED** and the Motion for Summary Judgment filed by Entergy Gulf States Louisiana, LLC [rec. doc. 116] is **DENIED**. Accordingly, the third party demand of Entergy Gulf States Louisiana, LLC against Penick Produce Company, Inc. is **DISMISSED WITH PREJUDICE.**

<u>FACTUAL AND PROCEDURAL BACKGROUND</u>

Plaintiff, Shannon Clardy ("Clardy"), filed the instant personal injury lawsuit against Bruce Foods Corporation, Bruce Foods Services, LLC (collectively "Bruce Foods") and Entergy. Entergy filed a Third Party Demand against Penick seeking indemnification pursuant

to the Louisiana Overhead Power Line Safety Act ("LOPLSA"), codified at La.R.S. 45:141, *et seq.*, alleging that Penick had violated LOPLSA by failing to give Entergy 48 hours advance notice prior to the work which led to Clardy's accident. [rec. doc. 34, ¶ ¶ 9, 10 and 11]. The main demand was subsequently settled. Entergy's indemnity claim is therefore the sole claim remaining before this Court.

Clardy was one of three truck drivers who worked for Penick, a family owned sweet potato distributer/broker, located in Vardaman, Mississippi. On September 22, 2008, Clardy was tasked with delivering sweet potatoes from Penick's Vardaman, Mississippi facility to Bruce Foods, located in New Iberia, Louisiana. Louisiana law required Bruce Foods to wash out the truck beds in which sweet potatoes were transported so as to limit the potential spread of sweet potato weevils. *See* La. Admin. Code tit. 7, pt. XV § 133 *et seq.*, specifically §§ 139 and 141. In compliance with this regulatory requirement, Bruce Foods instituted a "Truck Cleaning Policy" requiring "that all trucks delivering canner sweet potatoes to Bruce Foods [be] thoroughly cleaned of sweet potato debris and dirt before leaving the premises." *See* Penick MSJ, Ex. B.

Upon entering the Bruce Foods premises, truck drivers were told where the "washout" area was located. Employees of Bruce Foods would inspect the trucks after they had been washed out, and would not provide the driver the paperwork necessary for payment unless the truck was clean of sweet potato debris. *See* Penick MSJ, Ex. C, depo. of Norman Brown, Jr., pg. 79-82

In accordance with this procedure, after making his delivery, Clardy utilized the "washout" area Bruce Foods had designated for that purpose on its property. The "washout" area is equipped with a pressurized hose, a ladder and several sizes of rakes. *See* Penick MSJ, Ex. C, depo. of Norman Brown, Jr., pg. 80. Overhead power lines owned by Entergy ran above the designated "washout" area. Clardy lifted the bed of his truck to wash out the sweet potato debris, and received a severe electrical shock when the bed of his truck came into contact with these overhead power lines.

Previously, on September 13, 2004, another truck driver had raised the trailer of his truck and hit the same power lines, causing the tires on his truck to blow out. *See* Penick MSJ, Ex. E, depo. of Dale Boyer, pg. 38-39, 59-60; Ex. D, depo. of Gene Thibodeaux, pg. 28-32; Ex. F. Entergy was notified of this incident, and Entergy repaired the line to restore power to Bruce Foods. *See* Penick MSJ, Ex. F; Ex. D, depo. of Gene Thibodeaux, pg. 30-32. Bruce Foods instituted a policy requiring that a written notice be given to truck drivers, advising them of the power lines in the washout area, but apparently did not relocate the washout area away from the power lines. *See* Penick MSJ, Ex. E, depo. of Dale Boyer, pg. 38-39; Ex. D, depo. of Gene Thibodeaux, pg. 52.

After the 2004 incident and prior to this incident, Bruce Foods and Entergy had discussed repositioning the line underground as part of a conversion from a 240 to 480 volt line. Ex. D, depo. of Gene Thibodeaux, pg. 52, 59-60. As early as May, 2000, Entergy had estimated the cost to relocate Bruce foods' overhead power line "to provide additional clearance

to [Bruce Foods'] washout tower. . . ." *See* Penick, Ex. G; Ex. H, depo. of Elizabeth Trahan, pg. 12-13; Entergy MSJ, Ex. 24, depo. of Norman Brown, Jr., pg. 67-68.

## LAW AND ANALYSIS

**Standard on Motion for Summary Judgment**

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1] Rule 56(e) provides, in pertinent part, as follows, "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)[2], the court may: . . . (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."

If a motion for summary judgment is properly made and supported, the opposing party may not rest upon the allegations in his pleadings, but, rather, must go beyond the pleadings and designate specific facts demonstrating that there is a genuine issue for trial. *Celotex v.*

---

[1] Rule 56 was revised, effective December 1, 2010, "to improve the procedures for presenting and deciding summary-judgment motions and to make the procedures more consistent with those already used in many courts. The standard for granting summary judgment remains unchanged." *See* Committee Notes, Rule 56.

[2] Rule 56(c)(1) provides, in pertinent part, as follows:

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

*Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553-54 (1986). However, metaphysical doubt as to the material facts, conclusory allegations, unsubstantiated assertions and those supported by only a scintilla of evidence are insufficient. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

Furthermore, the evidence proffered by a party to satisfy its burden of proof must be competent and admissible at trial. *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) *citing Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987); *Thomas v. Price*, 975 F.2d 231, 235 (5th Cir. 1992). Summary judgment is mandated against a party who fails to make a showing sufficient to establish an essential element of that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

## LAW AND ANALYSIS

The pertinent provisions of LOPSLA provide as follows:

La. R.S. 45:142 provides:

> No person shall, individually or through an agent or employee, perform any function or activity upon any land, building, highway, waterway, or other premises, if at any time during the performance of any function or activity it is possible that the person performing the function or activity shall move or be placed within ten feet of any high voltage overhead line, or if it is possible for any part of any tool, equipment, machinery, or material used, handled, or stored by such person to be brought within ten feet of any high voltage overhead line or conductor during the performance of such function or activity.

Louisiana Revised Statute 45:143 provides:

> A. When any person desires to temporarily carry on any function, activity, work, or operation in closer proximity to any high voltage overhead line than permitted by this Chapter, the person or persons responsible for the work to be done shall

promptly notify the owner or operator of the high voltage overhead line prior to the scheduled commencement of the work. Such notice shall be reasonable, considering the work to be done; however, the notice shall not be less than forty-eight hours prior to the scheduled commencement of the work, exclusive of holidays and weekends, except in emergency situations that include police, fire, and rescue emergencies, in which case the notice shall be made as soon as possible.

B. The work shall be performed only after satisfactory mutual arrangements have been negotiated between the owner or operator of the high voltage overhead lines and the person or persons responsible for the work to be done. The owner or operator of the lines shall initiate the agreed upon safety arrangements within three working days and shall complete the work promptly, subject to emergency weather conditions. Arrangements may include placement of temporary mechanical barriers separating and preventing contact between material, equipment, or persons and high voltage overhead lines; temporary deenergization and grounding; temporary location or raising of the lines; or by other means deemed appropriate by the owner or operator of the lines.

C. The actual expense incurred by any operator or owner of high voltage overhead lines in providing clearances established in this Section shall be paid by the person or persons responsible for the work to be done in the vicinity thereof. The owner or operator of the lines may require an estimated payment of such actual expense in advance.

La. R.S. 45:144 A provides:

If a violation of this Chapter results in physical or electrical contact with any high voltage overhead line, the person violating this Chapter shall be liable to the owner or operator of the high voltage overhead line for all damages, costs, or expenses incurred by the owner or operator as a result of the contact.

Entergy's claims for indemnity from Penick is premised on this provision of La. R.S. 45:144 A. In its Third Party Demand, Entergy alleges that Penick violated LOPLSA when Clardy performed work within ten feet of Entergy's overhead power line located on the Bruce

Foods premises without notifying Entergy 48 hours in advance so that arrangements could be made to prevent Clardy from contacting the power line.[3]

---

[3] To the extent that Entergy argues in its Motion that a freestanding violation of this section supports its claim for indemnity, the undersigned finds this argument unpersuasive. OSHA regulations prohibit work within ten feet of a power line, at least in some circumstances. The Legislative history of LOPLSA demonstrates that LOPLSA was intended to go beyond OSHA to provide even greater protection for workers. The LOPLSA accomplishes this purpose by requiring responsible persons to provide 48 hours advance notice to the power company to allow the power company an opportunity to make the work site safe. As an economic incentive, to ensure compliance with the LOPLSA notice provision, the Act included an indemnity provision. Thus, the only violation contemplated by LOPLSA which triggers the indemnity obligation is a failure to provide the statutorily required advance notice set forth in § 143A of the Act, which results in a contact with a power line.

This interpretation is supported by the testimony of Chip Richardson, a Cleco representative, and Andy Dreher, an Entergy representative, before the Commerce Committee. Richardson identified the failure to notify as the sole basis for inclusion of the indemnity provision as follows:

> The intent of this thing is to say we can stop [a catastrophic accident] from happening. We can protect workers but we just have to know you are going to be working in the area. . . . All we're saying is call us. The people that are going to be doing the work know they are going to be working, obviously, near the line. Just call the utility and let us know you are going to be working there and we can make it safe so nobody gets hurt. . . . All this says if you know that you are going to be working in an area and you don't call us, then you would have to indemnify us for those costs. We're saying if you do call us then we're responsible. . . . All they have to do is contact us and it is our responsibility. . .
>
> \*   \*   \*
>
> . . . there are no other technical requirements of the bill other than notification. There simply is nothing else in the bill that is required . . . other than notify. So there can't be any violation other than failure to notify. . . . We're simply saying you must have an economic incentive to do it. . . . All we're saying is if you know you are going to be working by a line and you chose to violate the law and you chose not to tell us so we can make these things safe for these workers, then you have to indemnify us in that event.

See Penick MSJ, Ex. J, pgs 8-9; 25.

Dreher concurred with Richardson's statements, explaining that the indemnity obligation is triggered only by a failure to notify as follows:

> And Basically what we're asking is for people to contact us when they're within 10 feet of our lines. It's the OSHA currently. But we wanted to pass this on the books like 28 other states and hopefully put some teeth into the OSHA law, that we're asking for indemnity. If someone fails to notify us we're asking to be indemnified for that. We can't make the area safe if we don't know about it. So that's the basic tenet of the bill.

See Penick MSJ, Ex. J, pg. 4-5.

The "violation" which Entergy argues forms the basis for the indemnity provided by Section 143 is that Clardy (and through him Penick – Clardy's employer), was a "person responsible for the work" which Clardy was performing when he was injured. This case then turns on the meaning of the phrase "person or persons responsible for the work to be done" (as used in La .R.S. 45:143 and 144) under the specific facts of this case.

The Louisiana Legislature did not define this phrase.  Neither the Court nor the parties have located any Louisiana case directly addressing the meaning of this phrase in the LOPLSA under facts that are analogous to the facts presented here. Therefore, the Court's task is to decide how the Louisiana Supreme Court would interpret this phrase in Section 143 under the circumstances presented in this case.[4]

The meaning of this phrase is clearly highly fact specific. Obviously, who is defined as a "person responsible for the work" depends on the facts and circumstances of each job. On some jobs, the owner of the site might be responsible for the work; on other jobs, a contractor or a sub-contractor might be responsible. The facts of each case determine responsibility.

The issue of the interpretation of the LOPLSA on facts similar to those in this case is apparently *res nova* in Louisiana. Therefore, the Court's inquiry is guided by well-established Louisiana principles of statutory interpretation. *Moreno v. Entergy Corp.*, 105 So.3d 40, 48 (La. 2012).   The Court's analysis must begin with the words of the statute at issue. *Id.*  The starting point in the interpretation of any statute is the language of the statute itself.  Words and

---

[4]*CHS, Inc. v. Plaquemines Holdings, LLC,* 735 F.3d 231 (5th Cir. 2013).

phrases are to be read in context and are to be construed according to the common and approved usage of the language. *Id. citing* La. R.S. 1:3.

The meaning and intent of a law is determined by considering the law in its entirety and by placing a construction on the law that is consistent with the express terms of the law and with the obvious intent of the legislature in enacting the law. *Id., citing Kinchen v. Livingston Parish Council*, 967 So.2d 1137, 1140 (La. 2007) *quoting State v. Dick*, 951 So.2d 124, 130 (La. 2007).[5]

With these principles in mind, this Court's focus turns to the full text of La. R.S. 45:143. Subsection A sets forth the duty owed by the "person or persons responsible for the work", that is, the duty to notify the power company of the work before work begins. Subsection B provides for performance of the work "after satisfactory mutual arrangements have been negotiated" between the power company and "the person or persons responsible for the work to

---

[5]The Fifth Circuit's pronouncement on statutory construction in the context of an *"Erie* guess" is found in *CHS, Inc., supra.* There the Court said,

> When evaluating issues of state law, federal courts look to the final decisions of that state's highest court. *Chaney v. Dreyfus Serv. Corp.,* 595 F.3d 219, 229 (5th Cir.2010). In the absence of such a decision, 'we must make an *Erie* guess and determine, in our best judgment, how [the highest state court] would resolve the issue if presented with the same case.' *Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.,* 565 F.3d 948, 954 (5th Cir.2009) (quoting *In re Katrina Canal Breaches Litig.,* 495 F.3d 191, 206 (5th Cir.2007)). If we are to make an *Erie* guess with respect to the application of Louisiana law, we must employ the jurisdiction's civilian methodology and examine primary sources of law: the constitution, codes, and statutes. *Bradley v. Allstate Ins. Co.,* 620 F.3d 509, 517 n.2 (5th Cir.2010). We may also consider intermediate state appellate court decisions, although we are not bound by them. *Id.*

At p. 235.

be done." Subsection C provides that payment of the expenses associated with the negotiated mutual arrangements be borne by "the person or persons responsible for the work to be done in the vicinity thereof."

While this Court can envision circumstances where an injured worker's employer may be a "person responsible for the work to be done" under the statute, the facts of this case do not permit that result here. In this case, Bruce Foods required that Clardy washout his truck after delivery of his load of sweet potatoes. The Bruce Foods requirement was meant to comply with its obligations imposed by regulations issued by the Louisiana Department of Agriculture. See La. Admin. Code, tit. 7, pt. XV, § 133 *et seq.*[6]

---

[6] It is not clear that Penick had the same regulatory obligation. While there is no question that Louisiana, under its police power, could extend this requirement to Penick it is not clear that Louisiana has done so.
La. Admin. Code, tit.7, pt. XV § 139 reads in pertinent part as follows:

> § 139. Effect of Quarantine for Sweet Potato Weevil.
>
> \*      \*      \*
>
> C. Statewide
>
> \*      \*      \*
>
> 3. Sanitary Measures. Persons operating packing sheds, Assembly points, processing plants and/or storage houses shall:
>
> \*      \*      \*
>
> e. not move empty containers or equipment used in the handling of sweet potatoes from packing sheds or processing plants unless clean and free of all host materials.

It is clear that Bruce Foods operated a "processing plant" and was thereby covered under the regulation. Penick, on the other hand, did not operate such a plant in Louisiana. If this regulation places the responsibility for clean up on Bruce Foods, but not on Penick, the Court's reasoning that Bruce Foods

Bruce Foods designated the area where Clardy was required to washout his truck. Clardy was not allowed to choose where on the Bruce Foods premises he would perform this work. Part of the area designated by Bruce Foods as the washout area was in proximity to the Entergy power lines.

It is undisputed that Penick did not exercise control over the washout area designated by Bruce Foods. Penick does not own the premises on which the washout area is located. Penick was not involved in the selection of the area and had no authority to require Bruce Foods to designate a different area for this purpose. Further, it is clear that Bruce Foods personnel directed truck drivers to the washout area and, in effect, supervised the washout procedure by inspecting the washed trucks and withholding paperwork necessary for payment until the inspectors deemed the washout had been satisfactorily completed.

It is clear to the Court that Bruce Foods was the "person responsible for the work" which Clardy was doing at the time of the accident. Bruce Foods required the truck to be cleaned and designated the area where the cleaning was to occur. The cleaning was done for the benefit of Bruce Foods, which was required to make sure that the truck was clean before it left the Bruce Foods premises.

Bruce Foods had the control of the work site, specifically controlled the location of the work, and knew full well the work which was to be done at the site. Under the facts of this case,

---

and not Penick was " a person responsible" is even more clear. In that case, Bruce Foods would be acting pursuant to a legally imposed duty that Penick did not have.

11

it is clear to the Court that Bruce Foods, as the person in control of the site and the person who required the washout work be done, was "the person responsible for the work".

Both the language of the statute and the policy underlying the LOPLSA reinforce this interpretation.  LOPLSA was enacted to insure the safety of persons, like Clardy, who are required to work near high voltage lines, by providing a financial deterrent for those persons who control the work site and violate the statute.  Focusing liability on the party exercising ultimate control over the worksite therefore furthers this Legislative purpose, since that party determines where the work is to be done and, more specifically, the location of the work site's proximity to a power line.  The party controlling the worksite is also the party most likely to know of the existence and location of a high voltage power line, and is the party who is in the vastly superior position to guard against the danger posed by a high voltage power line near the work site.

On the other hand, placing liability on a party, like Penick, with little or no control over the worksite does not further the deterrent purpose of the statute, since a party who does not exercise at least some control over the worksite is not in a position to guard against the danger posed by a high voltage power line near the work site.  Indeed, imposing liability on a party like Penick which has little or no control over the worksite may actually have the opposite effect, by lessening the deterrent impact of the statute on the party who actually exercises control over the worksite, Bruce Foods here.

The statutory language likewise suggests that some control over the site is necessary to impose liability as a "person . . . responsible for the work." The introductory phrase in section A states: "When any person desires to temporarily carry on any. . . work . . . in closer proximity to any high voltage overhead line than permitted by this Chapter, the person or persons responsible for the work to be done shall . . . ." This introductory phrase focuses on those parties who desire to temporarily carry on the work and who therefore exercise some degree of control over the work site.

Likewise, section C goes on to provide that the expense of the mutually arranged safety precautions shall be paid "by the person or persons responsible for the work to be done in the vicinity thereof." Again, the focus is on the parties who are "in the vicinity" of the work and who therefore have some control over the work site. Surely, the statute cannot be read as requiring a person, like Penick, with no control over the worksite, to call a power company and negotiate safety arrangements with the power company, an act which Penick clearly had no authority to undertake, and then pay for those unauthorized safety arrangements for a worksite under the complete ownership and control of another person.

Furthermore, how could Penick even know that the overhead power lines existed over the washout area designated by Bruce Foods so that it could contact Entergy. Under the facts of this case, requiring Penick and persons similarly situated to bear the financial responsibility for accidents such as this would clearly lead to absurd results. Accordingly, the Court holds that Penick does not have the statutory duty of notification under the LOPSLA in this case.

13

The Court's construction of the LOPSLA under the facts of this case is supported by the Fifth Circuit's approval of the construction of a virtually identical Texas statute in *Hullum v. Skyhook Corporation*, 753 F.2d 1334 (5th Cir. 1985).  In linking the "person . . . responsible for the work to be done" to "some degree of control over the work site" the Court said,

> Focusing liability on those parties who exercise some degree of control over the work site furthers the Texas legislature's policy of worker safety since those parties determine where the work is to be done; those parties are the ones most likely to know whether or not the work will be performed near a power line. Placing liability on parties who do not exercise at least some control over the work site, on the other hand, lays the burden on parties who do not determine the location of the work site or its proximity to a power line. Indeed, placing liability on those with little or no control over the work site lessens the deterrent impact of the statute on those parties who do exercise control over the work site.

*Hullum*, 753 F.2d at 1337. While the facts of *Hullum* are not on all fours with the present case, the Court's rationale for the construction of the Texas statute under the circumstances presented in that case, is nevertheless consistent with the Court's rationale in this case.

In sum, under the facts of this case, the Court holds that the sole party responsible for notification under the statute was Bruce Foods, which exercised complete ownership and control of the washout area on its premises and benefitted from the work done by Clardy in cleaning his truck.[7]

Furthermore, the evidence here demonstrates that Entergy had already been notified of the work which was being done under its high voltage power line in the Bruce Foods washout area at least four years prior to Clardy's accident.  As early as September 13, 2004, Entergy had

---

[7]Entergy is still protected with the Court's interpretation of the LOPLSA. Entergy could have made its indemnity claim against Bruce Foods, something it said it intended to do in the Rule 26 Report filed in this case. [rec. doc. 27, p. 5]. Why Entergy then chose not to do so is not a part of this record.

14

been advised by representatives of Bruce Foods that trucks were raising their beds below the high voltage line in the washout area and, in fact, one such truck had actually made contact with the line causing a power outage, which Entergy was called upon to fix.

This information is verified not only by the deposition testimony of Gene Thibodeaux of Bruce Foods, but is also reflected on the Entergy "Trouble Ticket" generated as a result of that call. Further, Jay Southard of Entergy, who apparently responded to that call, while not specifically remembering the incident, did initially acknowledge that he had been to a previous call at the same location where another vehicle touched the line, and then confirmed his knowledge of the activities taking place in the washout area hypothesizing that "with trucks lifting their beds up in close proximity to that line all the time, possibly it was a truck again." *See* Entergy MSJ, Ex. 2, pgs. 45 and 47.

Finally, it is clear that Entergy was aware of the need for "additional clearance" for the line above the Bruce Foods "washout tower" in May, 2000, when Entergy provided Bruce Foods with the costs associated with moving the line to provide additional clearance. *See* Penick MSJ, Ex. G.

Given this prior notice provided by Bruce Foods and the undisputable knowledge of Entergy of the activities taking place in the Bruce Foods washout area, additional notice given by Penick would have been redundant and would not have furthered worker safety, the clear Legislative purpose behind the LOPLSA. Once Entergy received notice from Bruce Foods and acquired knowledge of the daily operations occurring at the Bruce Foods washout station in

close proximity to its overhead power line, the notice requirement under the statute was met.[8]

## CONCLUSION

For the above reasons, the Motion for Summary Judgment filed by Penick Produce Company, Inc [rec. doc. 47] is **GRANTED** and the Motion for Summary Judgment filed by Entergy Gulf States Louisiana, LLC [rec. doc. 116] is **DENIED**.  Accordingly, the third party demand of Entergy Gulf States Louisiana, LLC against Penick Produce Company, Inc. is **DISMISSED WITH PREJUDICE.**

Signed, July 31, 2014, at Lafayette, Louisiana.

*C. Michael Hill*
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

---

[8] It is possible that this fact caused Entergy to reconsider its initial decision, as set out in the Rule 26 Report, to file a Third Party Claim for indemnity against Bruce Foods.